UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

AVRIO GROUP SURVEILLANCE SOLUTIONS, INC.,

**REPORT**
**and**
Plaintiff,

**RECOMMENDATION**
v.

ESSEX INSURANCE COMPANY,                          **10-CV-00833A(F)**
FELICIA HELTON, and
JOHNSON CONTROLS, INC.,

Defendants.

_____

APPEARANCES:          HAGERTY & BRADY
                      Attorneys for Plaintiff
                      EDWIN P. HUNTER, of Counsel
                      69 Delaware Avenue
                      Suite 1010
                      Buffalo, New York  14202

                      CLAUSEN MILLER, P.C.
                      Attorneys for Defendant Essex Insurance Company
                      DAWN MARIE BREHONY, of Counsel
                      One Chase Manhattan Plaza
                      39th Floor
                      New York, New York  10005

                      CELLINO & BARNES, P.C.
                      Attorneys for Defendant Helton
                      MICHAEL J.  COOPER, of Counsel
                      451 Grider Street
                      Buffalo, New York  14215

                      GOLDBERG SEGALLA LLP
                      Attorneys for Defendant Johnson Controls, Inc.
                      JOHN P.  FREEDENBERG, of Counsel
                      665 Main Street
                      Suite 400
                      Buffalo, New York  14203

## JURISDICTION

This case was referred to the undersigned by Honorable Richard J.  Arcara, on November 3, 2002, for all pretrial matters.  The matter is presently before the court on Defendant Essex Insurance Company's motion to dismiss (Doc. No. 10), filed December 13, 2010.

## BACKGROUND

Plaintiff Avrio Group Surveillance Solutions ("Plaintiff" or "Avrio"), commenced this action on October 22, 2010, seeking a declaratory judgment ordering Defendant Essex Insurance Company ("Defendant" or "Essex"), to defend and indemnify Plaintiff in a personal injury action, pending in this court, *Helton v. Avrio Group Surveillance Solutions*, 09-CV-00494A(F) ("the personal injury action").  On December 13, 2010, Defendant filed the instant motion to dismiss the action as against Essex for failure to state a claim (Doc. No. 10) ("Defendant's motion"), asserting that the relevant insurance policy on which Plaintiff seeks to compel Essex to defend and indemnify contains two clauses excluding insurance coverage in the personal injury action.  Defendant's motion is supported by the attached Declaration of Dawn M. Brehony, Esq. ("Brehony Declaration"), Defendant Essex Insurance Company's Memorandum of Law in Support of Its Motion to Dismiss Plaintiff's Complaint Per Rule 12(b)() of the Federal Rules of Civil Procedure (Doc. No. 10-1) ("Defendant's Memorandum"), and the Affidavit of Rick Stickler for Defendant Essex Insurance Company (Doc. No. 10-2) ("Stickler Affidavit"), with exhibits A through F ("Defendant's Exh(s). __").  In opposition to Defendant's motion, Plaintiff filed on January 14, 2011, the Affidavit of Edwin P.  Hunter, Esq. (Doc.

2

No. 12) ("Hunter Affidavit"), the Affidavit of Prasanna Kattel (Doc.  No.  12-1) ("Kattel

Affidavit"), Plaintiff's Memorandum of Law in Opposition to the Motion to Dismiss by

Defendant, Essex Insurance Company Under Rule 12(b)(6) (Doc. No.  12-2) ("Plaintiff's

Memorandum"), and exhibits 1 and 2 ("Plaintiff's Exh(s). __").  Filed on January 25,

2011, was Defendant Essex Insurance Company's Memorandum of Law in Reply to

Opposition by Plaintiff Avrio Group Surveillance Solutions and in Further Support of Its

Motion to Dismiss Plaintiff's Complaint Per Rule 12(b)(6) of the Federal Rules of Civil

Procedure (Doc. No. 13) ("Defendant's Reply"), and the Declaration of Dawn M.

Brehony, Esq. in Reply to Plaintiff's Opposition (Doc. No. 13-1) ("Behony Reply

Declaration").  Oral argument was deemed unnecessary.

     Based on the following, Defendant's motion should be DENIED in part and

GRANTED in part.


## **FACTS**[1]

     On September 28, 2007, Plaintiff Avrio Group Surveillance Support ("Plaintiff" or

"Avrio"), a Maryland corporation regularly engaged in the installation of video

surveillance equipment, obtained from Defendant Essex Insurance Company

("Defendant" or "Essex"), a Virginia corporation, commercial general liability insurance

policy No. 3CX8648, effective September 28, 2007 through September 28, 2008 ("CGL

Policy").[2]  Essex issued and delivered the CGL Policy to Avrio through a Maryland

---

[1] Taken from the pleadings and motion papers filed in this action.

[2] Defendant's Exhibit F.

insurance broker, Bartlett, Griffin & Vermilye, Inc.  ("Bartlett, Griffin").  The CGL Policy

provides, *inter alia*, $ 1 million coverage for bodily injury per occurrence, $ 50,000

coverage for damage to rented premises per occurrence, and an aggregate limit of $ 2

million.  CGL Policy Supplemental Declarations.  Section I of the CGL Policy provides

coverage for bodily injury and property damage "caused by an 'occurrence' that takes

place in the 'coverage territory,'" during the effective policy period.  CGL Policy §

I.1.b(1) and (2).   A Products/Completed Operations Hazard Exclusion endorsement

renders the CGL Policy inapplicable "to 'bodily injury' or 'property damage' included

within the 'products/completed operations hazard" ("Completed Operations Exclusion").

CGL Policy Endorsement.  The CGL Policy also excludes from coverage claims for

bodily injury or property damages arising from an assumption of liability pursuant to a

contract or agreement ("Contractual Liability Exclusion").  Form ME-001(01/07) is a

Combination General Endorsement ("Endorsement")[3] to the CGL Policy, defining the

term "insured contract", Endorsement ¶ 4, and excluding from its coverage claims

arising out of breach of contract ("Breach of Contract Exclusion"), *id.* ¶ 5, professional

liability, errors, omission, and negligent acts ("Professional Liability Exclusion"), *id.* ¶ 8,

and negligent training, supervision, or monitoring of others ("Negligent Supervision

Exclusion"), *id.* ¶ 10[e].

Pursuant to a subcontract dated November 26, 2007 ("the Subcontract"), Plaintiff

Avrio, between November 26, 2007 and September 15, 2008, performed work as a

subcontractor to Defendant Johnson Controls, Inc. ("JCI"), on a wireless surveillance

---

[3] Plaintiff's Exhibit 2.

4

project for the City of Buffalo ("the wireless surveillance project"), which included the installation of video monitors ("monitors") at Buffalo Police Headquarters ("Buffalo Police").  On February 11, 2009, Essex received its first notice of occurrence/claim ("Notice of Claim") regarding an incident ("the incident') occurring on August 2, 2008, when one Felicia Helton ("Helton"), while working within the scope of her employment in the camera room at Buffalo Police Headquarters, was injured by a camera monitor ("the monitor"), falling on Helton's hand.  The Notice of Claim regarding the incident was provided to Essex by Avrio's insurance broker, Bartlett, Griffen.  On February 17, 2009, Essex issued a disclaimer letter to Avrio advising that insurance coverage with regard to the incident is excluded under the CGL Policy by (1) the Completed Operations Exclusion; (2) the Contractual Liability Exclusion; (3) the Breach of Contract Exclusion; (4) the Professional Liability Exclusion; and (5) the Negligent Supervision Exclusion.[4]

On March 18, 2009, Helton commenced a personal injury action in New York Supreme Court, Erie County, with regard to the incident ("the personal injury action"). In the complaint, Helton alleges the monitor that fell on her hand had recently been installed by Avrio, working as a subcontractor to JCI.  Both Avrio and JCI are named as defendants to the personal injury action.  On May 26, 2009, JCI, asserting diversity of citizenship as the basis for jurisdiction in this court, removed the personal injury action to this court. *Helton v. Avrio Group Surveillance Solutions*, 09-CV-00494A(F).  In its

---

[4] Defendant admits that when disclaiming coverage on February 17, 2009, Defendant erroneously referred to the Combination General Endorsement set forth on Form ME-001(01/05) ("Form ME-001 (01/05)).  Defendant's Memorandum at 15.  Defendant, however, maintains, and Plaintiff does not dispute, that the CGL Policy's Combination General Endorsement is actually provided for in Form ME-001(01/07), which contains language identical to that of Form ME-001(01/05).  As such, the court construes Defendant's reference to Form ME-001(01/05) as a typographical error with no bearing on the issues before the court on Defendant's motion.

Amended Answer filed in the personal injury action, JCI asserts a crossclaim against Plaintiff alleging the Subcontract obligated Plaintiff to name JCI as an additional insured under the CGL Policy to provide contractual coverage for Plaintiff's obligation to defend and indemnify JCI against any claims and lawsuits arising from Plaintiff's work in accordance with the Subcontract.  (09-CV-494A(F), Doc. No. 18, ¶ 13).

By letter dated June 23, 2010 ("June 23, 2010 Letter"),[5] Essex advised Avrio that Essex was declining to defend and indemnify Plaintiff with regard to the personal injury action commenced by Helton, as well as the crossclaim asserted by JCI against Avrio in the personal injury action.  June 23, 2010 Letter at 1-2.  According to Essex, coverage was being denied because JCI had not been named as an additional insured, and that even if JCI had been listed as an additional insured, coverage would still be denied based on (1) the Completed Operations Exclusion; (2) the Contractual Liability Exclusion; (3) the Breach of Contract Exclusion; (4) the Professional Liability Exclusion; and (5) the Negligent Supervision Exclusion.  June 23, 2010 Letter at 3-6.[6]  On October 20, 2010, Avrio commenced the instant declaratory judgment action seeking a judicial declaration that Essex has a duty to defendant and indemnify Avrio with regard to the personal injury action.

---

[5] Complaint Exh. E.

[6] In advising Avrio that coverage was being denied, Defendant again erroneously referenced Combination General Endorsement Form ME-001(01/05), instead of Form ME-001 (01/07).

## DISCUSSION

**1.     Motion to Dismiss**

Defendant Essex moves pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the

Complaint for failing to state a claim against Essex.  On a motion to dismiss under Rule

12(b)(6), the court looks to the four corners of the complaint and is required to accept

the plaintiff's allegations as true and to construe those allegations in the light most

favorable to the plaintiff.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Goldstein v.*

*Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (court is required to liberally construe the

complaint, accept as true all factual allegations in the complaint, and draw all

reasonable inferences in the plaintiff's favor).  Two recent Supreme Court cases require

application of "a 'plausibility standard,' which is guided by '[t]wo working principles.'"

*Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009) (citing *Bell Atlantic Corp. v. Twombly*,

550 U.S. 544 (2007), and quoting *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949

(2009)).  "First, although 'a court must accept as true all of the allegations contained in

a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals

of the elements of a cause of action, supported by mere conclusory statements, do not

suffice.'"  *Harris*, 572 F.3d at 72 (quoting *Iqbal*, 129 S.Ct. at 1949).  "'Second, only a

complaint that states a plausible claim for relief survives a motion to dismiss,' and

'[d]etermining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the review court to draw on its judicial experience and

common sense.'"  *Id*. (quoting *Iqbal*, 129 S.Ct. at 1950).  Despite *Twombly*, courts

remain obligated to liberally construe a *pro se* complaint.  *Harris*, 572 F.3d at 72 (citing

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).  The factual allegations of the complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true."  *Twombly*, 550 U.S. at 570.

In support of its motion to dismiss, Essex argues that insurance coverage under the CGL Policy is unavailable under the Completed Operations Exclusion, Defendant's Memorandum at 10-14; and that the Contractual Liability Exclusion precludes coverage to Avrio for any contractual indemnity claim by JCI.  Defendant's Memorandum at 14-18.[7]  In opposition, Avrio argues that it is not implausible that the despite the Completed Operations Exclusion, coverage is still available under the CGL Policy, Plaintiff's Memorandum at 3-10, and that Avrio's Subcontract with JCI is an insured contract, rendering the Contractual Liability Exclusion inapplicable.  *Id*. at 11-14.  In further support of dismiss, Essex asserts that coverage is unequivocally excluded under the Completed Operations Exclusion, Defendant's Reply at 1-6; and that because the wireless surveillance project Subcontract between Avrio and JCI does not qualify as an "insured contract" as defined in the CGL Policy, coverage is barred by the Contractual Liability Exclusion. *Id*.  at 6-10.

In opposing Defendant's motion, Plaintiff relies on the Kattel Affidavit to establish

---

[7] Although Essex also asserted the Breach of Contract Exclusion, the Professional Liability Exclusion, and the Negligent Supervision Exclusion as reasons for disclaiming coverage, Essex does not rely on these exclusions in moving to dismiss the Complaint for failing to state a claim.

that the Completed Operations Exclusion does not apply.  "Rule 12(d) of the Federal

Rules of Civil Procedure provides, 'If, on a motion under Rule 12(b)(6) or 12(c), matters

outside the pleadings are presented to and not excluded by the court, the motion must

be treated as one for summary judgment under Rule 56.  All parties must be given a

reasonable opportunity to present all the material that is pertinent to the motion.'"

*Hernandez v. Coffey*, 582 F.3d 303, 307 (2d Cir. 2009) (quoting Fed. R. Civ. P. 12(d)).

Thus, a district court properly converts a motion to dismiss for failure to state a claim

into a motion for summary judgment "when the motion presents matters outside the

pleadings, but the rule requires that the court give 'sufficient notice to an opposing party

and an opportunity for that party to respond.'" *Hernandez*, 582 F.3d at 307 (quoting

*Groden v. Random House, Inc.*, 61 F.3d 1045, 1052 (2d Cir. 1995) (holding district

court properly converted motion to dismiss for failure to state a claim into summary

judgment motion where nonmoving party had sufficient notice motion might be

converted given motion alternatively sought summary judgment, and nonmoving party

had opportunity to, and did, present evidence outside the pleadings)).  Nevertheless,

"formal notice is not required where a party 'should reasonably have recognized the

possibility that the motion might be converted into one for summary judgment [and] was

[neither] taken by surprise [nor] deprived of a reasonable opportunity to meet facts

outside the pleadings.'"  *Id*. (quoting *Villante v. Dep't of Corrections of City of New York*,

786 F.2d 516, 521 (2d Cir. 1986) (bracketed material in original)).  *See Reliance*

*Insurance Company v. Polyvision Corporation*, 474 F.3d 54, 57 (2d Cir. 2007) (holding

in action seeking reimbursement for surety payments made on certain performance

bonds district court could consider allegations and exhibits outside the pleadings in

9

resolving motion to dismiss for failure to state a claim without giving explicit notice it was converting motion to summary judgment where nonmoving party knew court was considering additional factual submissions, responded with its own evidentiary submissions, and did not object to the procedure).

In the instant case, although Defendant moves to dismiss under Rule 12(b)(6) for failure to state a claim, both parties submitted numerous exhibits, including relevant insurance policies, for the court's consideration.  Because such exhibits are outside the pleadings, Rule 12(d) requires the court convert the Rule 12(b)(6) motion to a motion seeking summary judgment.  Fed.R.Civ.P. 12(d); *Hernandez*, 582 F.3d at 307.  Moreover, because Essex is not proceeding *pro se* but, rather, is represented (as required of a corporation in federal court) by counsel, the court considers the fact that both Plaintiff and Defendant submitted numerous exhibits to support their respective positions on Defendant's motion as giving notice of the possibility the motion would be converted to summary judgment.  *Reliance Insurance Co.*, 474 F.3d at 57.  As such, Defendant's motion is converted to a motion for summary judgment.

Summary judgment of a claim or defense will be granted when a moving party demonstrates that there are no genuine issues as to any material fact and that a moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir. 1991).  The party moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact, and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor

10

may be drawn, a moving party cannot obtain a summary judgment. *Celotex* at 322.

Once a party moving for summary judgment has made a properly supported showing of

the absence of any genuine issue as to all material facts, the nonmoving party must, to

defeat summary judgment, come forward with evidence that would be sufficient to

support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*,

51 F.3d 14, 18 (2d Cir. 1995).


2.      **Choice of Law**

        Preliminarily, the court observes that because the CGL Policy was issued by

Essex's authorized insurance agency located in Maryland, and delivered to Avrio, a

Maryland corporation, through a Maryland insurance broker, Defendant relies on

Maryland law in construing the CGL Policy.  Defendant's Memorandum at 6-8.

Although not directly objecting to the application of Maryland law, Plaintiff asserts that

Defendant "looks to Maryland law to bolster its position and determination," Plaintiff's

Memorandum at 3, but then cites to Maryland law, as if to acquiesce in its application.

Nevertheless, in the interest of completeness, the court first considers whether the law

of Maryland applies to this action.

        Because the instant action is before this court on diversity jurisdiction, New

York's choice of law rules apply.  *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496

(1941) (holding federal courts exercising diversity jurisdiction must apply the choice of

law rules of the forum state); *Bakalaw v. Vavra*, 619 F.3d 136, 139 (2d Cir. 2010).  "It is

well-settled that New York has long recognized 'the use of 'center of gravity' or

'grouping of contacts' as the appropriate analytical approach to choice-of-law questions

in contract cases." *In re Liquidation of Midland Insurance Company*, __ N.E.2d __, 2011 WL 1233571 (N.Y. Apr. 5, 2011) (quoting *Zurich Insurance Company v. Shearson Lehman Hutton, Inc.*, 618 N.Y.S.2d 609, 617 (N.Y. 1994)). "'The purpose of grouping contacts is to establish which State has 'the most significant relationship to the transaction and the parties.'" *Id.* (quoting *Zurich Insurance Co.*, 618 N.Y.S.2d at 617 (quoting Restatement [Second] of Conflicts of Laws § 188[1])).

"In the context of liability insurance contracts, the jurisdiction with the most 'significant relationship to the transaction and the parties' will generally be the jurisdiction 'which the parties understood was to be the principal location of the insured risk . . . unless with respect to the particular issue, some other [jurisdiction] has a more significant relationship.'" *In re Liquidation of Midland Insurance Company*, __ N.E.2d at __, 2011 WL 1233571 (quoting *Zurich Insurance Co.*, 618 N.Y.S.2d at 617 (quoting Restatement [Second] of Conflict of Laws § 193)). Significantly, when determining which law governs a liability insurance contract providing coverage for risks in multiple states, "'the state of the insured's domicile should be regarded as a proxy for the principal location of the insured risk.'" *Id.* (quoting *Certain Underwriters at Lloyd's, London v. Foster Wheeler Corporation*, 822 N.Y.S.2d 30, 35 (1st Dep't 2006)). Using the state of the insured's domicile "promotes 'certainty, predictability and uniformity of result' in that '[t]he state of the insured's domicile is a fact known to the parties at the time of contracting, and (in the absence of a contractual choice-of-law provision) application of the law of that state is most likely to conform to their expectations.'" *Id.* (quoting Restatement [Second] of Conflict of Laws § 6[2][f] and *Foster Wheeler Corp.*, 822 N.Y.S.2d at 34-35). In the instant case, because Avrio is domiciled in Maryland,

and no other state has significant relationship to the insurance contract or its parties, New York law requires the court construe the CGL Policy according to Maryland law.

Further, with regard to insurance contracts, "Maryland follows the rule of *lex loci contractus*, which requires looking to the law of the place where the contract was made to determine questions of its validity and construction. *Aetna Casualty & Surety Company v. Souras*, 552 A.2d 908, 911 (Md. Ct. Spec. App. 1989) (citing *Traylor v. Grafton*, 332 A.2d 651, 660 (Md. 1975)). "The *locus contractu* of an insurance policy is the state in which the policy is delivered and the premiums are paid." *Id*. Accordingly, because Essex issued and delivered the CGL Policy to Avrio in Maryland, though a Maryland insurance broker, Maryland substantive law governs the court's construction of the CGL Policy.

"It is well established in Maryland that insurance policies are construed like other contracts." *Litz v. State Farm Fire and Casualty Company*, 695 A.2d 566, 569 (Md. 1997). "'[W]hen deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself.'" *Id*. (quoting *Bausch & Lomb Inc. v. Utica Mutual Insurance Co.*, 625 A.2d 1021, 1031 (Md. 1993)). Further, "[t]he duty to defend is broader than the duty to indemnify.'" *Id*. (quoting *Hartford Accident and Indemnity Co. v. Sherwood Brands, Inc.*, 680 A.2d 554 (Md. Ct. Spec. App.  1996), *vacated on other grounds*, 698 A.2d 1078 (Md. 1997)). "The duty to defend exists 'even though the claim asserted against the insured cannot possibly succeed because either in law or in fact there is no basis for a plaintiff's judgment.'" *Id*. (quoting *Brohawn v. Transamerica Insurance Co.*, 347 A.2d 842, 851 (Md.  1975)). Moreover, "an insurer has a duty to defend when there exists a

'potentiality that the claim would be covered by the policy.'" *Id*.  at 570 (quoting

*Brohawn*, 347 A.2d at 850).  "Under the potentiality rule, the insurer will be obligated to

defend more cases than it will be required to indemnify because the mere possibility

that the insurer will have to indemnify triggers the duty." *Id*. (citing *Hartford Accident*,

680 A.2d at 560).

      "A potentiality of coverage is typically established by the allegations in the tort

plaintiff's complaint."  *Litz*, 695 A.2d at 570 (citing *Brohawn*, 347 A.2d at 850).  Extrinsic

evidence, however, including the insured's answer to the complaint, may also be used

to establish a potentiality of coverage.  *Id*. (citing *Aetna Casualty & Surety Company v.

Cochran*, 651 A.2d 859, 865 (Md.  1995)).  "When extrinsic evidence, but not the

allegations of the complaint, establish a potentiality of coverage, the insured may rely

on evidence outside of the complaint."  *Id*.  Significantly, "the insurer should not be

allowed to refuse to defend based solely on allegations in the complaint because the

insured is completely at the mercy of the tort plaintiff's pleadings to establish a

potentiality of coverage."  *Id*. (citing *Cochran*, 651 A.2d at 866).  "The promise to defend

the insured, as well as the promise to indemnify, is the consideration received by the

insured for payment of the policy premiums."  *Brohawn*, 347 A.2d at 851.

      In the instant case, the record establishes that, despite the Completed

Operations Exclusion, a potentiality of coverage exists, such that Essex is required to

provide Avrio with a defense in the personal injury action, but that coverage for any

contractual indemnity claim JCI may assert against Avrio is nevertheless excluded by

the Contractual Liability Exclusion.

3.      **Completed Operations Exclusion**

Essex argues that insurance coverage under the CGL Policy is unavailable

under the Completed Operations Exclusion because in the personal injury action it is

alleged that Helton sustained her injuries while using the monitor that had recently been

installed by Avrio, such that the CGL Policy no longer provided insurance coverage for

the work installing the monitor as it appears from these allegations that Aviro's

installation of the monitor may was then completed.  Defendant's Memorandum at 10-

14.  In opposition, Avrio argues that under the CGL Policy, as written, there is a

potential for coverage because it is unclear, and thus a question for trial, whether

Helton, at the time of the incident, was using the video monitor for its intended purpose.

Plaintiff's Memorandum at 3-8.  Alternatively, Avrio asserts that the term "intended use"

as it appears in the Completed Operations Exclusion is ambiguous and that such

ambiguity must be resolved against the drafter, *i.e.*, Essex, Plaintiff's Memorandum at

8-10,  In further support of dismiss, Essex asserts that coverage is unequivocally

excluded under Completed Operations Exclusion.  Defendant's Reply at 1-6.

The CGL Policy excludes coverage for bodily injury "[i]ncluded within the

'products-completed operations hazard.'" CGL Policy § 1, COVERAGE C MEDICAL

PAYMENTS ¶ 2.f.  As relevant, the Completed Operations Exclusion is defined in the

CGL Policy as follows,

16.     "Products-completed operations hazard":

a.      Includes all "bodily injury" and "property damage" occurring away
        from premises you own or rent and arising out of "your product" or
        "your work" except:

        (1)     Products that are still in your physical possession; or

15

(2)     Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

   (a)     When all of the work called for in your contract has been completed.

   (b)     When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

   (c)     *When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.*

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

CGL Policy § V - DEFINITIONS (italics added).

As relevant to the instant action, Helton alleges in the personal injury action that

On or about August 2, 2008, at approximately 1:05 a.m. plaintiff Felicia Helton was in the camera room of the Buffalo Police Headquarters using the recently installed camera monitor when said monitor fell on her left hand thereby sustaining injuries and damages as hereinafter alleged.

Personal Injury Action, 09-CV-00494A(F), Complaint ¶ 10.

Essex maintains that because Helton alleges with regard to the personal injury action that she was injured while putting the camera monitor to its intended use, CGL Policy excludes coverage under the Completed Operations Exclusion, CGL Policy § V [16][a](2)(c).  Defendant's Memorandum at 10-14.  In its answer to the Personal Injury Action Complaint, Avrio asserts that "the incident complained of in the complaint and the alleged damages were caused by the misuse of the installed product."  Personal Injury Action, 09-CV-00494A(F), Avrio Answer (Doc.  No.  3), ¶ 11.  As such, Avrio is

asserting that at the time of the incident, the camera monitor was not being used in accordance with its intended use as required to deny coverage under the Completed Operations Exclusion, specifically, ¶ 16[a](2)(c).  *Litz*, 695 A.2d at 570 (the insured's answer to the complaint is extrinsic evidence on which a potentiality of coverage may be established).

In opposition, Plaintiff maintains that on August 2, 2008, the date of the incident, Avrio's work on the job-site was ongoing with installation and configuration of the monitors continuing until mid-September 2008.  Defendant's Memorandum at 7.  In support of this position, Defendant submits the Affidavit of Avrio Director of Systems and Integrations Prasanna Kattel (Doc. No. 12-1) ("Kattel Affidavit").  Kattel was the Project Manager for the wireless city-wide surveillance project to which the Subcontract between Avrio and JCI, and the work performed by Avrio under the Subcontract, pertains.  Kattel Affidavit ¶ 1.  Kattel states that "[a]t the time of the alleged injury on August 2, 2008, AVRIO's work with respect to the monitor at the Project work site in the command room was not completed as AVRIO was installing and configuring monitors. That work was ongoing and cameras were still being added to the system . . . ."  *Id*. ¶ 6. Kattel explains that at the time of the incident, the Buffalo Policy had yet to decide "whether to mount the monitors using brackets or position the monitors on stands.  Two alternatives were under consideration, one using a stand with placement of the monitors on the desk tops, and the other by mounting monitors to the desk wall."  *Id*. ¶ 8.  Regardless of how the monitors were positioned in each work station, "[m]onitors were to be located upon the workstation desk tops and the PCs located below the work stations."  *Id*.  Further, "[t]he work stations or desk cubicles were provided by another

sub-contractor, Wrightline, which also supplied mounting brackets for monitors." *Id*. ¶ 7.  The Buffalo Police did not decide to have the monitors placed on the work station desk tops until "late in August, 2008 and the mounting brackets were returned to Wrightline following that decision." *Id*. ¶ 10.  According to Kattel, "[m]any monitors were functional to a point, but the work of installation and configuration was certainly not completed by August 2, 2008." *Id*. ¶ 9.  Kattel continued that because the installation of software to the workstation PCs, and monitor connection and configuration at the work stations continued into September 2008, the Crime Analysis/Video Surveillance Center was not dedicated until September 12, 2008.  *Id*.  That the monitor that allegedly fell onto Helton's hand, causing Helton's claimed injury on August 2, 2008, was mounted on brackets, and the Buffalo Policy subsequently decided to place the monitors on the workstations, rather than to mount the monitors on brackets, establishes an issue of fact as to whether the monitor had been installed and put to its intended use, thus constituting completed work for the purpose of triggering the Completed Operations Exclusion.

Both Avrio and Essex rely on the same case, *Zurich Insurance Company v. Principal Mutual Insurance Company*, 761 A.2d 344 (Md. Ct. Spec. App. 2000) ("*Zurich Insurance*"), in support of their respective positions regarding the Completed Operations Exclusion.  Defendant's Memorandum at 12-13; Plaintiff's Memorandum at 4-7; Defendant's Reply at 2-6.  A plain reading of *Zurich Insurance*, however, establishes it supports Defendant's position.

Specifically, at issue in *Zurich Insurance* was whether an insurance company, pursuant to a contractors protective liability policy, was obligated to defend and

indemnify the owner and manager of an office building against liability for personal injuries caused when an elevator malfunctioned. *Zurich Insurance*, 761 A.2d at 346-47. Prior to the malfunction and in preparation for a project to modernize the building's elevator service, the elevator had undergone safety tests performed by an elevator maintenance contractor, requiring the elevator be temporarily removed from use by the building's office workers. *Id*. at 346. When the safety tests were completed, the elevator was returned to regular service for use by the building's office workers. *Id*. The insurer sought a declaration that because the contractors had returned the elevator to regular service prior to the malfunction, a completed operations exclusion, essentially identical to the Completed Operations Exclusion at issue in the instant action, permitted the insurer to deny coverage. *Id*. at 346-47. The Maryland Court of Special Appeals, in reviewing the trial court's grant of summary judgment, found that because the contractors, after performing the safety tests, had returned the elevator to regular service, "the elevators were available for normal use," and that the contractors were no longer on the premises, *id.*, there was no question that the elevator had malfunctioned while being used in its intended manner despite the fact that the work to modernize the building's elevator service had yet to commence, such that the completed operations exclusion permitted the insurer to deny coverage. *Id*. at 349.

In contrast, in the instant case, not only had Avrio, as of August 2, 2008, according to Kattel, not completed its work pursuant to the Subcontract, but Avrio remained on site as it continued to configure the monitors and, moreover, awaited the Buffalo Police's decision's whether to have the monitors mounted on brackets to the desk walls above the workstations, or to place the monitors on stands directly on the

workstations' desk surfaces.  The record thus establishes a question of fact as to whether Avrio's work on the monitor that fell on Helton's hand was complete, such that the monitor, when used by Helton on August 2, 2008, was even capable of being put to its intended use.

Alternatively, Plaintiff asserts the term "intended use" as it appears in the Completed Operations Exclusion is ambiguous because the term is subject to more than one reasonable interpretation, that the CGL Policy does not provide a specific definition for the term, and that such ambiguity must be resolved against the drafter, *i.e.*, Essex.  Plaintiff's Memorandum at 8-10.  In opposition to this argument, Defendant maintains that the absence of a definition in the CGL Policy does not render the term "intended use" ambiguous, and that the term "intended use" has been interpreted by Maryland courts, with a completed operations exclusion held valid and enforceable. Defendant's Reply at 6 (citing *Zurich Insurance*).

Maryland law provides that insurance policies "ordinarily are construed in the same manner as contracts generally."  *Collier v. MD-Individual Practice Association, Inc.*, 607 A.2d 537, 539 (Md. 1992) (holding that insurer, who had denied insurance coverage to insured's dependent, a university student, on basis that dependent failed to qualify as a "full-time student" under the university's criteria, could not incorporate by reference university's criteria for a "full-time student" in place of specifically defining the term in the insurance contract).  Maryland does not follow the rule that "insurance contracts are to be construed most strongly against the insurer."  *Id*. (citing *Cheney v. Bell National Life Insurance Company*, 556 A.2d 1135, 1138 (Md. 1989)).  Rather, the subject insurance instrument is to be construed as a whole to discern the intention of

the parties. *Id*. (citing *Pacific Indemnity Company v. Interstate Fire & Casualty Company*, 488 A.2d 486, 488 (Md. 1985).  "Words are accorded their ordinary and accepted meanings."  *Id*.  Further, "[t]he language used may be ambiguous if it is 'general' and may suggest two meanings to a reasonably prudent layperson." *Id*. (quoting *Pacific Indemnity Company*, 488 A.2d at 489).  If the disputed language is ambiguous, extrinsic evidence may be consulted to discern the parties' intent, and '[t]he court may construe an ambiguous contract if there is no factual dispute in the evidence.'"  *Id*.  If, however, "after considering extrinsic evidence, the ambiguity remains, it will ordinarily be resolved against the person who drafted the contract."  *Id*.  (citing *Mutual Fire, Marine and Inland Insurance Company v. Vollmer*, 508 A.2d 130, 134 (Md. 1986)).

Here, although Essex could have provided a specific definition of "intended use" within the CGL Policy, it did not do so.  It is not, however, as Defendant suggests, Defendant's Reply at 6, the failure of Essex to define the term "intended use" in the CGL Policy but, rather, the fact that the term is subject to more than one reasonable meaning that renders the term ambiguous.  *Collier*, 607 A.2d at 539.  Further, the very argument before this court establishes that the term "intended use" is subject to more than one reasonable meaning.

In particular, Essex would define the term "intended use" to include any use of the monitor once the monitor is sufficiently installed to permit an employee to view images on the monitor, despite the fact that such images may not be as clear as intended because the configuration is not complete, or that the user became injured because the monitor may have only been temporarily installed.  In contrast, Plaintiff

21

urges the court to construe the term "intended use" as referring to use of the monitor after it has been permanently installed and configured. Significantly, absent from the record is any affidavit made by anyone with knowledge stating that the monitor that fell on Helton's hand was permanently and securely installed.

Accordingly, the term "intended use" as it appears in the Completed Operations Exclusion is ambiguous. Nor does any other evidence in the record, albeit prior to the completion of discovery, resolve the ambiguity. Moreover, "[d]oubts as to whether an allegation indicated the possibility of coverage should be resolved in the insured's favor." *Utica Mutual Insurance Company v. Miller*, 746 A.2d 935, (Md. Ct. Spec. App. 2000) (citing *United States Fidelity & Guar. Co. v. National Paving and Contracting Co.*, 178 A.2d 872, 879 (Md. 1962)). As such, given the ambiguity created by the term "intended use," there exists a "'*potentiality* that the claim could be covered by the policy.'" *Litz*, 695 A.2d at 570 (quoting *Brohawn*, 347 A.2d at 850 (italics in original)), summary judgment in favor of Essex is precluded.

Under Maryland law, although the potentiality for coverage, no matter how slight, gives rise to a duty to defend, the issue may nevertheless be determined prior to trial of the underlying tort action in a declaratory action, like the instant action. *Brohawn*, 347 A.2d at 848. In particular,

> A declaratory judgment action prior to the trial of a tort action against the insured may under some circumstances be a valuable means of resolving questions of policy coverage *where those question are independent and separable from the claims asserted in a pending suit by an injured third party*. An early resolution could avoid unnecessary expense and delay to the parties.

*Brohawn*, 347 A.2d at 848 (italics added).

In contrast, "[w]hen a question sought to be resolved in the declaratory judgment

proceeding would be decided in the pending tort action, however, it is ordinarily inappropriate to grant a declaratory judgment prior to resolution of the underlying tort trial." *Litz*, 695 A.2d at 574 (citing *Brohawn*, 347 A.2d at 848).

Significantly, in *Litz*, the Maryland Court of Appeals held that the lower appellate court "properly entertained the declaratory judgment action" by holding a trial on the issue of the duty to defend based on whether the defendant was, as the time of the underlying tort involving injury arising out of babysitting by defendant insured, where insurer disclaimed coverage based on the relevant homeowner's policy's business pursuits exclusion. *Litz*, 695 A.2d at 574. In particular, at the declaratory judgment trial, the insured introduced evidence that the defendant insured's babysitting constituted a business pursuit because the defendant provided regular care and babysitting services to the infant in exchange for financial compensation. *Id*. The defendant insured countered with evidence that she had only agreed to babysit as a favor to a neighbor and only for a temporary period of time. *Id*. The circuit court found in favor of the insurer. *Id*. Because the issue of whether the defendant insured's babysitting constituted a business pursuit within the meaning of the insurance policy's business pursuits exclusion was irrelevant to any question to be decided in the underlying tort action, the granting of a declaratory judgment in favor of the insurer was affirmed. *Id*.

Similarly, in the instant case, the question whether the monitor that fell on Helton's hand had been put to its "intended use" is irrelevant to any question to be decided in the underlying personal injury action. Specifically, the record in this case, including Plaintiff's answer asserting misuse of the monitor by Helton, and Kattel's description of the incomplete status of the project at the time of the incident and that the

Buffalo Police subsequently decided not to install the monitors using mounting brackets, establish an issue of fact as to whether, on the date Helton was injured, the installation of the monitor was complete and the monitor had been put to its intended use, such that there exists a potential for coverage under the CGL Policy with regard to the incident.  Alternatively, the term "intended use" as it appears in the CGL Policy's Completed Operations Exclusion is subject to more than one reasonable interpretation, such that the term is ambiguous and creates an issue of fact as to whether Essex may deny coverage for the incident pursuant to the Completed Operations Exclusion. Whether the monitor had been put to its intended use when Helton was insured so as to negate coverage does not necessarily prevent Avrio from asserting at trial that Helton misused the monitor.  As such, a separate evidentiary hearing, *see*, *e.g.*, *Brohawn*, 347 A.2d at 847 (referring to the fact that an evidentiary hearing was held in the trial court before the judge to determine the question of insurance coverage), should be held to determine the disclaimer on this ground.[8]

Accordingly, insofar as Defendant relies on the Completed Operations Exclusion to deny coverage, Defendant's motion should be DENIED.


4.     **Contractual Liability Exclusion**

Essex argues that the CGL Policy's Contractual Liability Exclusion precludes insurance coverage for any contractual indemnity claim JCI may assert against Avrio based on the incident.  Defendant's Memorandum at 14-18.  In opposition, Plaintiff

---

[8] Furthermore, because Plaintiff has not served and filed a demand for a jury trial as required under Fed.R.Civ.P. 38(b), Plaintiff has waived the right to a jury trial on the issue.

asserts that Avrio's Subcontract with JCI is an insured contract, rendering the

Contractual Liability Exclusion inapplicable.  Plaintiff's Memorandum at 11-14.  In

further support, Essex argues that because the Subcontract between Avrio and JCI

does not qualify as an "insured contract" as defined in the CGL Policy, coverage is

barred by the Contractual Liability Exclusion.  Defendant's Reply at 6-10.

The CGL Policy's Contractual Liability Exclusion provides

2.      Exclusions

This insurance does not apply to:

* * *

b.      Contractual Liability

"Bodily injury" or "property damage" for which the insured is
obligated to pay damages by reason of the assumption of liability in
a contract or agreement.  This exclusion does not apply to liability
for damages:

* * *

(2)      Assumed in a contract or agreement that is an "insured
contract", provided the "bodily injury" or "property damage"
occurs subsequent to the execution of the contract or
agreement.

CGL Policy § I - COVERAGES.

As modified by the Combination General Endorsement Form ME-001 (01/07)

("Endorsement Form ME-001 (01/07), in effect at the time of the incident, an "insured

contract" is defined as

any written (A) - Lease of premises . . . (B) - Easement agreement . . . (C) -
Indemnification of a municipality . . . (D) - Sidetrack agreement . . . (E) - elevator
maintenance agreement.

Endorsement Form ME-001 (01/07) ¶ 4.

According to Defendant, the Subcontract into which Plaintiff and JCI entered on November 26, 2007, and pursuant to which Avrio was installing the monitors does not qualify under any of the five categories of "insured contract" specified in Endorsement Form ME-001 (01/07) ¶ 4.  Defendant's Memorandum at 15-18.  Plaintiff does not dispute that the Subcontract is not within any of the five categories of "insured contract" set forth in Endorsement Form ME-001 (01/07) ¶ 4, but maintains that but for the insurance exclusion contained in Endorsement Form ME-001 (01/07) ¶ 4, the Subcontract would qualify as an "insured contract" such that the Contractual Liability Exclusion would not apply.  Plaintiff's Memorandum at 12.  According to Plaintiff, Defendant, in defining the term "insured contract" in Endorsement Form ME-001 (01/07) ¶ 4, failed to emphasize the term through the use of italics or quotation marks, thereby rendering the CGL Policy's provisions confusing and contradictory.  *Id*.  Plaintiff further maintains that Endorsement Form ME-001 (09/07), which replaced Endorsement Form ME-001 (01/07) in the renewed CGL Policy Essex issued Plaintiff effective September 27, 2008, does not limit the definition of an "insured contract" to a contract falling within the five categories set forth in  Endorsement Form ME-001 (01/07) ¶ 4. *Id*.  at 12-13.  According to Plaintiff, Essex's inclusion of Endorsement Form ME-001 (01/07), in the CGL Policy in effect as of August 2, 2008, rather than Endorsement Form ME-001 (09/07), establishes Essex failed to deal with Plaintiff fairly and in good faith. *Id*.  at 13-14.  In further support of dismiss, Defendant maintains that Plaintiff's arguments regarding the contractual liability exclusion are without any legal support.  Defendant's Reply at 7-8.

As Plaintiff asserts, in the absence of Endorsement Form ME-001 (01/07) ¶ 4,

the term "insured contract" would be afforded the definition found in the CGL Policy

which provides

> 9.    "Insured contract" means:
>
> * * *
>
> f.    That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization . . . .

CGL Policy § V - DEFINITIONS.

As defined under the CGL Policy, Plaintiff's Subcontract with JCI would qualify as an

"insured contract" to which the Contractual Liability Exclusion would not apply.

Nevertheless, although Endorsement Form ME-001 (09/07) does not include

language similar to that found in Endorsement Form ME-001 (01/07) ¶ 4, and thus does

not limit the definition of an "insured contract" to one of the five categories set forth

thereunder, Endorsement Form ME-001 (09/07) was not made a part of the CGL Policy

in effect at the time of the incident.  As such, that Endorsement Form ME-001 (09/07)

does not limit coverage to "insured contracts" that are within one of five categories is

irrelevant to this action.  Nor is there any merit to Plaintiff's argument concerning

Endorsement Form ME-001 (09/07), or the fact that the term "insured contract" is not

emphasized through the use of italics or quotation marks.

Significantly, Maryland law provides that an insured has a duty to read and

understand the terms of an insurance policy, and to promptly notify the insurer of a

refusal to accept the policy.  *Liberty Mutual Insurance Company v.  Ben Lewis*

*Plumbing, Heating & Air Conditioning, Inc.*, 710 A.2d 338, 341 (Md. 1998).  If an

insurance policy is accepted or is retained for an unreasonable length of time, the insured is presumed to have agreed to the policy's terms. *Id*. These criteria particularly apply where the insured is a sophisticated business entity with previous experience purchasing insurance. *Id*.

In the instant case, Plaintiff purchased the CGL Policy containing Endorsement Form ME-001 (01/07) in September 2007, with its effective dates listed at September 28, 2007 though September 27, 2008. As such, at the time of the incident on August 2, 2008, the CGL Policy, along with Endorsement Form ME-001 (01/07), had been in effect for more than 10 of its effective 12 months such that Plaintiff is presumed to have agreed to the terms of the CGL Policy, as modified by Endorsement Form ME-001 (01/07) ¶ 4, under which the Subcontract would not qualify as an "insured contract." Nor does Plaintiff characterize itself as less than a sophisticated business entity without previous experience purchasing insurance. On this record, there is no material issue whether the contractual liability exclusion applies to the Subcontract such that Essex is not obligated under the CGL Policy to provide Avrio with insurance coverage for any contractual indemnity claim by JCI against Avrio in connection with the personal injury action.

Defendant's motion to dismiss should be GRANTED with regard to the Contractual Liability Exclusion.

## CONCLUSION

Based on the foregoing, Defendant's motion to dismiss (Doc. No. 10), converted to one seeking summary judgment, should be DENIED in part and GRANTED in part. The matter should be scheduled for an evidentiary hearing for resolution of whether Defendant Essex properly disclaimed insurance coverage under the Completed Operations Exclusion.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      May 17, 2011
            Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      May 17, 2011
            Buffalo, New York